Good afternoon. We're here for one argument in Appeal No. 19-22-66, United States v. Samuel Nichols. Good afternoon, Your Honors. My name is Attorney Erica Bierma and I was appointed to represent Samuel Nichols in this appeal. Before the Court this afternoon are three issues. Specifically, whether the District Court erred in concluding that Mr. Nichols was competent to represent himself at trial, whether Nichols knowingly and intelligently waived his right to counsel, and third, whether the District Court erred in calculating Nichols's advisory sentencing guideline range. So I will start with the competency to represent himself at trial. The Supreme Court in Edwards has limited the right to self-representation, particularly when there is a mentally ill defendant that seeks to represent himself. The decision has to be made with, one, the dignity and autonomy of the individual, two, the right to fair trial, and three, the right to a trial that appears to be fair to all who observe it. And so it's possible that the District Court should have appointed counsel to Mr. Nichols because I would submit that, one, he did not receive a fair trial and two, the right to trial didn't necessarily appear fair to all who observed it based on what happened, as the Court can see from this record. And when competency is in question, it's whether the defendant has the present ability to consult with the attorney to a reasonable degree of rational understanding and whether he has a rational and factual understanding of the proceedings. And I would submit that the Court can see from the record that Mr. Nichols had three competency evaluations. He had one that was performed by the government, the second one was performed by the request of the defense, and then third, there was a competency evaluation pending sentencing that initially asked for a retroactive evaluation to see whether or not Mr. Nichols was confident to represent himself at trial. However, the District Court declined to have a retroactive evaluation but allowed a competency evaluation for sentencing. And so, I would submit that the Court has to consider a higher standard for those who are proceeding versus proceeding to trial pro se under Edwards. That the District Court can provide or may require counsel if they believe that the defendant is... When you say higher standard, can I ask you about that? Yes, absolutely. So, Edwards, of course, is, at least to my eye, it's more in the Faretta line. Would you agree with that? Yes. Okay. And it's in particular focused on defendants who may be suffering from some form of mental illness or impairment. You get into this kind of gray area issue. And we know what the Court holds. It's in the briefs, you know, in that when you think about, well, there's going to have to be extra sensitivity, right? That may be what you're referring to. Extra sensitivity to the particular needs or limitations of the defendant. When you look at what happened here, the District Court judge, you know, had Dr. Goldstein evaluate Mr. Nichols. You then had Dr. Fields at the recommendation of defense, but then, unfortunately, Mr. Nichols chose not to cooperate fully with Dr. Fields. So, I'm thinking, I don't know what else the District Court really could have done. And then, of course, she had some external non-examination material. The telephone calls and, you know, things like that. Correct. The factual recitation is correct, but let's look at the kind of the Well, first of all, let's back up. He was indicted in 2016. So, then the first competency evaluation was performed going into the status conference in December of 2017. By Dr. Goldstein? Correct. Yeah. And when Dr. Goldstein evaluated Mr. Nichols, I would submit that some of the information that she learned during the course of that evaluation appeared to be kind of like a red herring to her, and I don't know that it necessarily was factored into her analysis as to whether or not he's confident. And what I mean by that is he was hospitalized repeatedly as a juvenile. You know, there's the history of his hospitalizations for behavioral issues and otherwise. She also kind of, she didn't necessarily, that didn't reflect in her opinion as to what she She also didn't talk to him about some of the other things that she learned about, like his personal history, the fact that he said that he wasn't understanding. I mean, she did, I mean, there were a lot of things in his history that he had previously been on medication when he was a anxiety drug. It's not an antidepressant. That's usually related to, it's a mood stabilizer that usually can be prescribed for people that have bipolar, so that would be falling into the more significant mental illness category. And in her evaluation, she doesn't necessarily reflect anything about what she thinks about that or how does that factor into her opinion about his confidence. And I agree with the court's characterization of extra sensitivity when you're talking about a defendant who wants to proceed to trial pro se. That's, that when, that's just, that's our shorthand here in the argument, but that's what you mean by kind of a heightened burden. Yes, you're correct. Then also Mr. Nichols, he was colloquied in December and that was before the substantive, what I'll call the competency hearing, which was in March. And so during that time, that's when the district court kind of went through the colloquy with him about his education, experience in the court system, previous experience of working with counsel. But at that point in time, I would argue that competency was still in dispute because the first evaluation had been done, but the formal competency hearing had not, had not occurred yet such that there was a finding that he was competent. And also the district court spends a lot of time in that same colloquy talking to Mr. Nichols about the qualifications of his counsel. You know, she's like, these are the most seasoned lawyers in the building. You know, she had them kind of, in essence, recite their resumes, for lack of a better description. And that doesn't necessarily get to the question of whether or not Mr. Nichols can represent himself because he understands what voir dire is. He understands how to strike jurors. Does he know what an opening is? Does he know what a closing is? You know, this was happening pre the finding of competency. So in my opinion, that would be still in dispute at that point in time. So then there were additional status conferences after the competency hearing wherein she still didn't, the district court still didn't colloquy Mr. Nichols about whether or not he's competent to represent himself at trial. She provides a lot of, you shouldn't do this, this is a bad idea, you shouldn't be representing yourself. She does a lot of that. But unfortunately, I would submit that the record is deficient in the sense that after that finding, she never said, you know, let's go through all these questions like the Feretta questions. And also, she just warns him. You know, this isn't a good idea, this is a very complicated case, you don't have a law degree, you should work with your lawyers. But then she also appoints his counsel that were standby to actually act as advocacy counsel during the competency hearing. So we kind of have this back and forth too between full representation, standby, he's pro se. So there's a lot of back and forth about the status of representation over the course of this case as well. And then when he wouldn't work with them after the competency, he says, then the district court says, you're off, referring to the two standby counsel. But again, there's no colloquy with the defendant about his ability to represent himself. I want to ask you a question about the Feretta factors and the fourth factor here, which I think is kind of what you're getting at here. The fourth factor is the context of the defendant's decision to waive. Should we consider at all the trial and the manner in which the defendant conducted himself at trial in considering whether or not the district court erred with respect to that first factor? Now, of course, the district judge didn't have the benefit of the way the trial would play out when she made the decision that he had waived, effectively waived his right to counsel. But on appeal, should we consider and look at the trial and the manner in which the trial was conducted and the manner in which the defendant conducted himself at trial in considering the context in which the waiver decision was made? Your Honor, I would submit that you can't kind of look back retroactively to say, okay, when we take the entirety of the record, this looks like he's competent. But why? Because, and I'm not asking about the competence. So for a second, put the competence aside. I'm asking under the Feretta factors, if he waived. Did he waive? Was his obstinance with dealing with counsel a waiver? And we can consider the context. Why shouldn't we on appeal be able to look at what happened during the trial to add color to the context? Well, I mean, to determine whether or not he knowingly and intelligently waived his right to counsel under the Feretta factors, you can look at the context of what was going on at the time of the waiver. Right. I'm with you there. Not necessarily the totality of the trial. But why should we not look at that? Because now on appeal, we have the benefit of the trial record. Why should we just ignore it in determining whether or not the district judge's decision in considering the context was wrong? I mean, I haven't seen any cases that specifically address whether or not Feretta can be applied retroactively, of whether or not you can look back at the totality of the trial to see how did the person do. I think that you have to look at it in the context of what was going on at the time of the purported waiver. And obviously, it's the appellant's position that it was an annoying and intelligent waiver based on the lack of colloquy with him. And also, the district court kept referring to it as a constructive waiver versus an actual waiver. It was, right? Because he kind of was, he said many times he wanted a lawyer, right? He said he wanted a lawyer, but the lawyer wouldn't do the things that he wanted him to do, right? Including file motions and things like that. The district judge ultimately construed that as, hey, look, you're not, you say you want a lawyer, but you're not doing anything to indicate to me that you do. Right. And he says, I mean, he says repeatedly, I want a lawyer, I want a lawyer. But he just asked for a new lawyer. And that's the other piece of this is, you know, he had two counsel that were kind of co-counsels and simultaneously representing him versus a fresh set of eyes that came in and looked at the case and took over representation. But he never, he wasn't of the position that he just wanted to represent himself. It kind of came out through the record that he felt as though he ended up representing himself because of the way that the district court construed his behavior, that it was a constructive waiver versus an actual waiver. Can you go back to the timeline you were drawing out for Judge Scudder? What is the overarching takeaway point you wanted us to take from that timeline? From the timeline is that competency was still in dispute as of the time that the district court went through these questions with him about his prior experience in the system, his prior interactions with counsel. And after the finding that he was competent, there were no additional colloquies with him. So arguably the finding as it relates to competency was in dispute because we had the report from Dr. Goldstein, but we didn't have Dr. Fields' report yet. So that's the timeline that I would like your honors to take away. The idea that the competing report doesn't happen until after the finding of competency? Correct. Okay. So you have Dr. Goldstein's report saying competent. He asks for a secondary evaluation that was ordered by the district court. And in the interim is when she goes through the litany of questions with Mr. Nichols about representing himself, his prior experience in the system. Has he worked with prior counsel? What happened in his prior cases? I mean, that's the most substantive colloquy she has with him, and that's prior to the actual finding of competence. So we don't have the competing report yet. Okay, very well. If you want to reserve, we'll give you a couple minutes on rebuttal. Thank you. Okay, great. Ms. Peterson, good afternoon. Good afternoon, and may it please the court. Michelle Peterson on behalf of the United States. The district court did not clearly err in finding the defendant competent, nor did it abuse its discretion in allowing the defendant to represent himself at trial. The district court's competency findings were reached after a detailed hearing where the district court heard testimony from the doctors that had evaluated the defendant. She listened to jail calls where the defendant was discussing his case and his case strategy and the competency evaluations, and she talked about her own observations of the defendant over the span of the case. Can you address the point we just left off with Ms. Beersma? That is, I understand that Ms. Beersma really wants us to pay attention to the fact that the court makes this finding before she has the benefit of Dr. Fields' report. That's incorrect. If we're talking about the competency finding, that happens after Dr. Fields' report. So the timeline for competency is defendant requests an evaluation. The court selects an examiner for him. That's Dr. Goldstein. After he gets the results, he asks to contest it. The district court allows him to get a second competency evaluation. That's Dr. Fields. After both of those reports are done, the district court then holds a competency hearing where Dr. Goldstein testifies and is cross-examined, Dr. Fields testified and is cross-examined, and different jail calls are admitted into evidence. And only after all of that does the district court make a finding as to the competency of the defendant. She found after hearing all of that testimony and evidence that he understood the charges against him, he was able to consult with standby counsel even though he was choosing not to, he did not have a mental disease or defect, a severe mental disease or defect. The district court did discuss the fact that he did have behavior, some behavioral illnesses that had been with him since childhood, but that didn't render him incompetent, and that was Dr. Goldstein's finding as well. And importantly, the district court found during the competency hearing and after that the defendant had feigned incompetence and that his requests for competency evaluations were a delay tactic and an appellate strategy. And none of these findings were clearly erroneous. Once the district court had made those findings, she certainly did not abuse her discretion in allowing the defendant to represent himself. His waiver was knowing and voluntary. There were multiple colloquies with the defendant where the district court reminded him that he was facing life in prison, that he didn't have the legal training to take this on. She asked him in a detailed manner for him to talk about all of his prior state cases. What did he see the lawyers do? How did he interact with them? She warned him repeatedly it was not a good idea to go pro se because he did not have the training or experience, and she spent in numerous hearings talked with him about the fact that his counsel were there ready to represent him. And in the end, after the competency hearing, she asked him, are you willing to let your standby counsel represent you? And he said, this is not an exact quote, but something along the lines of, if I'm going to jail, I'm going to send myself to jail. I'm not going to let anyone else send me to jail. These colloquies were adequate. And when this court reviews whether or not the defendant's waiver of counsel was knowing and voluntary, there's a number of factors that this court can look to. First of all, looking at the adequacy of the Faretta colloquies, which were more than adequate. Look to evidence in the record about whether or not the defendant understood the dangers and disadvantages that he faced. And there is ample evidence he understood what he faced. He talked to Dr. Goldstein about how he knew it was a bad idea. He talked to his friend on a jail call about how he knew he wouldn't be able to do his case as well as an actual lawyer. And he repeatedly consulted with standby counsel, which shows he understood sort of the gravity of what he was up against. This court can also look to the background and experience of the defendant. And part of that prong is his performance in the trial. How did he do? Did it show that he understood the gravity of what he had took on? That's discussed in Sandals and some other cases. And in this case, he did. He was successful on certain counts getting a not guilty verdict from the jury. He advanced coherent trial themes. He lodged objections. He cross-examined witnesses. He gave an opening. He gave a closing. He performed well. The district court praised some of his abilities, saying that he was excellent at cross-examination, for example. And the district court also found that he manipulated the proceedings to try to delay them in the hopes that the complaining witnesses would decide not to testify. And his manipulation shows he understood the process and he understood what he was up against. He had a strategic reason to go pro se, multiple strategic reasons. He got to file motions that didn't have legal merit because he wanted them filed. He got to delay the proceedings. And he got to personally cross-examine the witnesses, all things that were his strategic advantage, and all go sort of towards this in favor of the idea that his waiver was knowing and voluntary. So when your point earlier, Ms. Peterson, when you were emphasizing the many different status conferences and hearings in which Judge Kendall asked various questions, your point there is it may not look like other FRERTA cases that come up here look where you have, over the course of six transcript pages at a singular hearing, a FRERTA colloquy that way. But your point is it's not deficient just because in substance it occurred in multiple different proceedings and was perhaps a bit piecemeal here. Because when you piece it all together, it's sufficiently thorough to satisfy the standard. Yes, I think that that's accurate. There certainly is one longer colloquy than the rest of them, and it's in the beginning of the government's appendix. Is that the one where she called a break and said, your lawyers can tell you very well what happens at trial, I want you to meet with them, and then we'll come back in and pick back up again? She does that towards the beginning. In the beginning when there's some conflict, when the defendant wants his counsel to file motions that don't have merit, she does ask them. This is, I think, in the spring. It's the beginning of when his journey towards pro se happens. She does take a break and takes 30 minutes or such and tells standby counsel to meet with him and talk about going pro se. But even in those early days, she's warning him, you're facing life. This isn't a good idea. The longest colloquy happens in December 2017, and that's the one that's at the beginning of the government's appendix. That's where the district court goes case by case, talks about what he's had in the past, talks about what the lawyer did, goes through his education in detail. Many of these topics have been covered previously, but this was sort of the most robust time that it happened. So certainly altogether, this parodic colloquy alone, I would submit, is enough, but when you add in the other pieces, it's more than enough to find a knowing and intelligent waiver. And the point of all these colloquies is not to ensure that the defendant could do a good job or to give him a robust legal education. The point of these warnings and questions is just to remind, to show the defendant what he's up against so that his waiver is knowing and intelligent. And that's exactly what happened in this case. Do you acknowledge that there is a difference between being competent? I mean, just stepping back from this case, being competent to stand trial and being competent to represent oneself? And if so, where is the line? And I'm wondering, why ought we not require two distinct inquiries, as Mr. Nichols is suggesting? Just stepping back. Yes, Your Honor. Under this circuit's case law, the standard is the same, whether or not for competency to proceed to trial and competency to represent oneself. That's U.S. v. Anzaldi. Edwards, this court has said that Edwards, the Supreme Court in Edwards talked about what the law permits, not what it requires. So following Indiana v. Edwards, there's a narrow band of defendants where it would be constitutionally appropriate for a judge to deny their request to go pro se. But it doesn't have to. The court would be allowed to do it, but it's not required to do it. And the key point is a competent defendant, right? Deny a competent defendant's request to go pro se because they're in this gray zone. Correct. And the gray zone has been described as a narrow zone. It's been described by this court in Jordan v. Hepp as a defendant who cannot handle matters himself and who needs a lawyer almost in the capacity of a guardian. And the case law also talks about somebody who has a severe mental illness. It's not someone who has a limited education. It's not someone who has maybe a behavioral disorder. It's not someone who wants to advance legal theories that are novel. It's a very narrow band of people who are barely competent enough to stand trial but are just not competent enough to get up in court and make an opening statement and understand how that works. And that's a very, very narrow band of people. It's certainly not Mr. Nichols who has no severe mental illness and was perfectly capable at trial of making arguments, objecting, asking questions. And for this defendant, both doctors who evaluated him agreed. He understood the nature of proceedings against him, and he was able to work with counsel if he chose to do so. Seeing no further questions, I would respectfully request this court affirm the conviction and sentence. Very well. Thank you. Ms. Bierma, we'll give you a couple minutes on rebuttal. Thank you, Your Honor. If I may, I'd like to kind of go back to one of Your Honor's questions about the colloquy of the kind of the collective reflection on the colloquy. I would submit that the colloquy has to be, again, going back to the timeline, that substantive robust colloquy that the government referenced was in December of 2017 before the competency finding. So we didn't have that competency finding at that point in time. The substantive competency hearing wasn't until March of 18. And so during the status conferences where she continues to warn him against representing himself, she doesn't engage in a colloquy with him, meaning a back-and-forth exchange. She's just telling him why it's a bad idea. And also, when you're talking about the severe mental illness, this court has not defined what severe mental illness is for purposes of these gray area defendants. And I would submit that Mr. Nichols' history, first of all, he wasn't cooperative the second day of the evaluation. He has personality disorders. To what extent, we don't really know. I mean, Dr. Goldstein said he is antisocial, but beyond that, we don't know. He has a history of hospitalization, but again, that wasn't analyzed in the context of the competency evaluation of Dr. Goldstein. He has a history of acting out behavioral issues and not being able to conform his behavior to an expectation of the setting. And again, he was on DEPA code. So because this court hasn't defined severe mental illness, I can't, Mr. Nichols, we can't say that Mr. Nichols isn't severely mentally ill. And for those reasons, we would respectfully request that the court send this matter back, remand this matter back. I'm sorry. Let me just ask about that. Wouldn't we expect those points then to come out in Dr. Fields' report? Like that's the point of a competing evaluation. And so to the extent they didn't, that is a hole we have in the record here. That's correct because Mr. Nichols didn't cooperate with Dr. Fields. And so, I mean, again, that kind of speaks to his mental status. If he's not going to even cooperate with a defense expert, that speaks to what his mental illness might be or what his mental concerns might be, knowing full well that that is the defense expert. Very well. Thank you. Thank you. Thank you for your time. Ms. Pirma, a special thanks to you for taking the case on appointment, serving Mr. Nichols, and for your service to the court. So thank you. Ms. Peterson, thanks to you and to the government as well. That will conclude this afternoon's argument. We'll take the case under advisement.